**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-468 (PLF)** |
| **v.** | : | |
| | : | |
| **LOIS LYNN MCNICOLL,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Lois Lynn McNicoll to fourteen days incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.

### I.   Introduction

Defendant Lois Lynn McNicoll is a seventy-year-old former Los Angeles County Department of Public Social Services (DPSS) manager who participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on May 23, 2022 (ECF No. 24, ¶ 6), reflects a sum of "more than $1.4 million dollars for repairs," as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

McNicoll pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), which makes it unlawful for an individual or group of individuals to willfully and knowingly parade, demonstrate, or picket in any of the Capitol Buildings. As explained herein, a brief custodial sentence is appropriate in this case because McNicoll was well-aware of the restrictions on entering both the Capitol Grounds and the Capitol itself, having visited the Capitol on prior occasions including in the days before January 6, but nonetheless marched with other rioters through the chaos of the West Lawn and up to the Capitol. Once inside, she remained there for nearly forty minutes, repeatedly marching around the Crypt and sometimes gathering with other rioters. She only left when she was ushered out by law enforcement. McNicoll later told an FBI agent that she had not taken any pictures while inside the Capitol, a claim that was proven to be false by the photos that were recovered from her phone.

The Court must also consider that McNicoll's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building and disrupt the proceedings. As Judge Bates has recognized:

> The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.

*United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17. The defendant's actions and those of her fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours. During another sentencing hearing, Judge Chutkan acknowledged, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25. Here,

the defendant's participation in a riot that succeeded in halting the Congressional certification combined with the defendant's knowledge that the Capitol was off-limits, the significant amount of time she spent inside the Capitol, and the less-than-truthful statements she made to the FBI renders a brief custodial sentence appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol from the Statement of Offense. ECF No. 24, ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed directly and indirectly to the violence and destruction of that day.

### Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each assault helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By Order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Image 1 as "1st Police Barricade," circled in red and marked with the letter A. At 12:52 p.m., the first breach of the outer perimeter occurred. Several members of the crowd jumped over and pushed down the unmanned bicycle-rack barricades at the Peace Circle. The crowd then advanced into the restricted area to

engage with USCP officers at the first manned barrier. Less than a minute later, the crowd already numbered in the hundreds, and the mob shoved the handful of USCP officers around the barrier out of the way. By 12:58 p.m., the rioters crossed the unmanned barrier halfway down Pennsylvania Walkway and overwhelmed the second manned police barrier, marked with the letter B on Image 1. They flooded into the area labeled "Lower West Plaza" and marked with the letter C on Image 1, quickly filling the space and pushing against the barricade.



*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area. The two sides fought over the establishment and reinforcement of a police defensive line on the Plaza using fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of

weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd grew rapidly, supplemented by those—like McNicoll—who walked the mile-and-a-half from the Ellipse to the Capitol. At approximately 2:03 p.m., Metropolitan Police Department officers—who had come to the Capitol in response to USCP officers' calls for assistance— broadcast a dispersal order to the crowd. It began with two blaring tones, which were followed by a 30-second announcement. The announcement played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately. This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area grew as crowds streamed towards the West Front. Complete with an active melee and visible projectiles, it looked like a battle scene.

After having actively defended their line for over an hour, the mob finally succeeded in

outnumbering and flanking the hundreds of officers at the front of the inauguration stage.[2] They were under continuous assault from thousands of rioters directly in front of them. Other members of the mob climbed up onto scaffolding above and to the side of the officers, and some rioters hurled projectiles onto the police officers. Because many of the people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., their situation was untenable. Openings in the perimeter already led to breaches of the Capitol. Several large gaps appeared in the police defensive line at the West Front. The officers called a general retreat. With their defensive lines extinguished, the crowd surrounded several police officers. The rioters seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, a reality that allowed the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[2] *See* https://twitter.com/ryanjreilly/status/1561483624104562693 for a time lapse of the West Land and West Plaza from 12:55 p.m. to 2:28 p.m., and https://twitter.com/ryanjreilly/status/1561484563297325057 for that same area from 2:28 p.m. to 4:01 p.m.



*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

*Lois Lynn McNicoll's Role in the January 6, 2021 Attack on the Capitol*

Lois Lynn McNicoll traveled all the way from California to Washington, D.C., to attend the former President's rally. She arrived in Washington, D.C. several days early. Among the places she visited was the U.S. Capitol, but she could not access either the grounds or the interior of the building because of barriers that were in place. McNicoll did not attempt to push down the barricades or access the Capitol at that time.

McNicoll is familiar with the proper procedures for entering the U.S. Capitol lawfully. When speaking with the FBI in a non-custodial setting, McNicoll recalled a time approximately five years ago when she toured the Capitol. She recalled that she was required to set up the visit through her elected Representatives. She recalled that prior to entering she was given and required to always display a visitor badge. She recalled that she had to go through security measures before entering the building, including going through a metal detector. McNicoll recognized that on January 6, she did none of those things. McNicoll maintains, however, that on January 6, 2021, she did not feel like she was doing anything wrong when she joined other rioters in entering the Capitol and remaining inside for approximately forty minutes.

There are not any videos or photos at this time that the government is submitting that show McNicoll as she makes her way from the Ellipse to the Capitol. However, as described above, to get to the Senate Wing Doors at approximately 2:55 p.m., McNicoll would have likely had to cross the West Lawn and the West Plaza, locations where rioters had been waging a battle against police officers for over two hours. There would have been the smell of chemical spray, various flags, trash, and projectiles strewn about the area, and the continued chants and yells of the rioters. The rioters that filled the inauguration stage scaffolding and the West Plaza would remain there fighting, chanting, yelling, and attacking for at least two more hours.

McNicoll not only knew or should have known that she should not be in the Capitol, but she knew why she and her fellow rioters were there: to stop the steal. She knew that because for nearly the entire time that she was inside the Capitol, McNicoll held a sign that stated "STOP THE STEAL." When she was inside the Capitol, McNicoll admitted to walking around an area she called "the rotunda." Surveillance shows that McNicoll never entered the Capitol's Grand Rotunda, which is on the second floor of the Capitol, but she did spend a significant period of time—approximately thirty minutes—marching circles around the Crypt. Given the fact that the Crypt is the same circumference as the Rotunda and also sits in the middle of the Capitol, McNicoll was likely referring to the Crypt. A collection of screenshots taken from USCP surveillance that shows McNicoll's time inside the Capitol has been attached hereto as Government Exhibit 1.



*Image 5: At approximately 2:55 p.m., McNicoll entered the Capitol through the Senate Wing Door. This was part of the second breach of that entrance, which happened at approximately 2:47 p.m. The Senate Wing Door itself was broken open and had an alarm going off. It was flanked by two windows, both of which were broken out and had rioters streaming through them.*

 

*Images 6, 7: (left) At approximately 3:01 p.m., McNicoll can be seen using a digital device in a manner that is consistent with taking a picture. (right) This image was recovered from McNicoll's phone.*

When McNicoll spoke with the FBI, she indicated that her phone remained in her purse which remained tucked inside her jacket. She claims that she never took it out. Images 6 and 7, above, show that McNicoll did remove her phone and take pictures. Images 5 and 6, above, are also full of indicia that McNicoll should not have been inside the Capitol.



*Image 8: McNicoll walked around the Crypt for approximately thirty minutes, carrying a sign that said TRUMP on one side and STOP THE STEAL on the other. The above screenshot is from 3:17 p.m. McNicoll and others were escorted from the Capitol at approximately 3:33 p.m.*



*Image 9: At approximately 3:33 p.m., USCP officers escorted McNicoll and others out of the Capitol via a door known as the Memorial Door.*

### *Defendant's Interview*

#### *McNicoll's Pre-arrest Interview with the FBI*

On May 18, 2021, prior to her arrest and in a non-custodial setting, McNicoll gave an interview to FBI agents. During that interview, McNicoll made the admissions detailed above, including her prior visit to the Capitol and the reason and length of her January 2021 trip. She also misrepresented to the FBI whether or not she had taken photos or recorded video while on restricted grounds or while inside the Capitol on January 6.

### *The Charges and Plea Agreement*

On June 23, 2021, the United States charged McNicoll by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 28, 2021, law enforcement officers arrested McNicoll. On July 15, 2021, the United States charged McNicoll by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On May 23, 2022, pursuant to a plea agreement, McNicoll pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

McNicoll now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, the Section 3553(a) factors weigh in favor of fourteen days incarceration, 36 months' probation, sixty hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing McNicoll's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had McNicoll personally engaged in violence or destruction, he or she would be

facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of McNicoll is therefore not a mitigating factor in misdemeanor cases.

McNicoll pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case. McNicoll decided to march with other individuals from the Ellipse to the Capitol, make her way through the sights of flags, the sounds of flashbangs, and the smell of freshly sprayed chemical irritant on the West Lawn. She made her way through the growing number of rioters there, climbed the northwest steps underneath the inaugural scaffolding with its torn tarp flapping in the wind, and up to the northwest plaza.

There, amidst the sizeable group of rioters, stood one broken-out door—commonly referred to as the Senate Wing Door—flanked by two broken-out windows. At approximately the same time that McNicoll was in the northwest plaza, rioters were flooding through another recently breached door on the north perimeter of the northwest plaza—commonly referred to as the Parliamentarian's Door. None of this appears to have given McNicoll pause as still she entered through the Senate Wing Door at around 2:55 p.m.

McNicoll stayed inside the Capitol for nearly forty minutes, holding a sign that said STOP THE STEAL and walking numerous circles around the circumference of the Crypt. She was one of the last rioters to leave the Capitol, finally being ushered out by police at around 3:33 p.m. Even though surveillance video shows McNicoll appearing to take photographs and record videos, she later told the FBI that she had not ever taken her phone out of her pocket. However, photographs taken from inside the Capitol were recovered from McNicoll's phone.

Accordingly, the nature and the circumstances of this offense establish the clear need for a brief term of incarceration in this matter.

### B.  The History and Characteristics of McNicoll

As set forth in the PSR, McNicoll does not have any criminal history. She is currently unemployed. She was previously employed by the Los Angeles Department of Public Social Services from 1985-2021. PSR ¶ 49. As such, she was additionally familiar with government buildings, security measures required to enter them, and the importance of restricted access to sensitive government areas and working spaces.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

> *General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although McNicoll lacks any criminal history, her entry into the Capitol through the violently breached Senate wing door as part of a mob is troubling, especially in light of her prior visits to the Capitol, including in the days before January 6, and awareness of the proper procedures for entering the Capitol lawfully. That combined with her lengthy stay of almost forty minutes and lack of candor with interviewing FBI agents suggest the need for limited specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence McNicoll based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot. Although those like McNicoll convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[5] *See United States v. Anna*

---

[4]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

McNicoll has pleaded guilty to Count four of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A

---

disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the precise balance of aggravating and mitigating factors present here, other judges of this court have found the length of time a defendant spent inside the Capitol to be a pertinent factor in assessing his or her individual role in the riot. *See, e.g., United States v. Gruppo*, 1:21-CR-000391-BAH, 10/29/2021 Sent. Tr. at 11, 36 (evaluating the length of time the defendant spent inside the Capitol at sentencing); *United States v. Croy*, 1:21-CR-000162-BAH, 11/5/2021 Sent. Tr. at 89 (same).

 Indeed, each minute that any rioter spent in the Capitol depleted officer resources badly needed to secure the building, and put them and others at risk. In *United States v. Baker*, 1:21-CR-00273-TFH, Judge Hogan emphasized the defendant's length of time inside the Capitol in sentencing him to 9 days intermittent confinement and 24 months' probation. Baker entered the

Capitol after seeing the eastern Rotunda doors breached twice and remained inside for an hour. 1:21-CR-00273-TFH ECF No. 34 at 2. There was no indication that Baker was not truthful with interviewing FBI agents, as is the case here.

In addition, the government has also sought, and judges of this court have imposed, custodial sentences in cases in which a defendant is not truthful with interviewing FBI agents. *See, e.g., United States v. Heinl,* 1:21-CR-00370-EGS (imposing 14 days incarceration); *United States v. Caplinger*, 1:21-CR-00342-PLF (imposing 35 days incarceration); *United States v. Revlett*, 1:21-CR-00281-JEB (imposing 14 days incarceration); *United States v. Paul Van Bernewitz*, 1:21-CR-00307-CRC (imposing 30 days incarceration).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.      This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.**

This Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," i.e., a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has

been convicted of a "petty offense." *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB) ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Kevin Blakely*, 21-cr-356 (EGS), ECF 38 (D.D.C. July 14, 2022)(imposing split sentence); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[6]  But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or

---

[6] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

supervised release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) (D.D.C. June 2, 2022) ECF 43  (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to fourteen days incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing his acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  _____

SEAN P. MURPHY
Assistant United States Attorney
D.C. Bar No. 1187821
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov

/s/ *Sonia Mittal*_____
Sonia Mittal
Assistant United States Attorney
Illinois Bar No. 6314706
601 D Street NW
Washington, DC 20001
Tel. (202) 821-9470
sonia.mittal@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 22nd day of August 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/ *Sonia Mittal*</u>
Assistant United States Attorney
Illinois Bar No. 6314706
601 D Street NW
Washington, DC 20001
Tel. (202) 821-9470
sonia.mittal@usdoj.gov