UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>LOIS LYNN MCNICOLL<br><br>        Defendant. | Case No. 1:21-cr-468 (PLF) |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Lois Lynn McNicoll, by and through her attorney of record, the Federal Public Defender's Office for the Central District of California and Deputy Federal Public Defender Lillian Chu, hereby files defendant's sentencing memorandum in the above-captioned matter. For the reasons discussed below, Ms. McNicoll respectfully submits that a sentence of 12 months of probation is sufficient, but not greater than necessary to achieve the purpose of sentencing in this case.

## I. INTRODUCTION

Ms. McNicoll is a 70-year old retiree who dedicated 35 years of her life to public service, raised two children, and survived domestic violence. She entered the Capital building during the events of January 6th, which she has taken responsibility for by pleading guilty in this case. The government request a custodial sentence of 14 days, 60 hours of community service, and a restitution payment of $500. For the reasons discussed below, Ms. McNicoll's actual conduct, however, justify a significantly lower sentence of 12 months of probation and 60 hours of community services. Ms. McNicoll already paid the restitution in this case. *See* Exhibit E.

1

## II.  A NONCUSTODIAL SENTENCE IS WARRANTED IN
## MS. MCNICOLL'S CASE

The Supreme Court has consistently held that federal judges should impose sentences that are not greater than necessary to satisfy the statutory purposes of sentencing, consider all the characteristics of the offender and circumstances of the offense, reject advisory guidelines that are not based on national sentencing data and empirical research, and serve their function in the constructive evolution of responsible guidelines.  *See U.S. v. Booker*, 543 U.S. 220 (2005); *Rita v. U.S.*, 127 S. Ct. 2456 (2007); *Gall v. U.S.*, 128 S. Ct. 586 (2007); *Kimbrough v. U.S.*, 128 S. Ct. 558 (2007); *Spears v. U.S.*, 129 S. Ct. 840 (2009); *Nelson v. U.S.*, 129 S. Ct. 890 (2009).

The applicable sentencing statutes provide that a sentencing court "shall impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing. 18 U.S.C. §§ 3553(a), 3582(a), and 3661. In arriving at the appropriate sentence, § 3553(a) directs sentencing courts to consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender; (3) the need to impose a punishment that reflects the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (4) to afford adequate deterrence; (5) to protect the public from further crimes; (6) to provide the defendant with needed education, vocational training, medical care or other correctional treatment; (7) the kinds of sentences that are available; and (8) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(1), (2), (3), (4), (6).

**A.     THE NATURE AND CIRCUMSTANCES OF MS. MCNICOLL'S OFFENSE JUSTIFY A PROBATIONARY SENTENCE**

The defense acknowledges that the seriousness of the events at the Capital on January 6, 2021, but submits that the Court should order a noncustodial sentence for Ms. McNicoll based on her conduct.  This Court needs no reminder that the sentencing guidelines do not apply here and that misdemeanor conduct, as opposed to felony conduct, is recognized as less serious under the law.  In particular, Ms. McNicoll's conduct should place her into the least offensive, least egregious category of January 6th defendants as her participation in the events at the Capital was

2

unplanned, she was entirely non-violent, she made no political statements, and she made no social media posts.  Ms. McNicoll did not join any "mobs," only walked in circles around the crypt, and never ventured near the Senate or House Floors or entered any offices.  She left the Capital when asked to do so by police (Plea Ag. Statement of Offense at ¶ 10 (Dkt No. 24)) and followed the curfew order when she heard there would be one.  Complaint at 8 (Dkt No. 1-1).

Arguably, the most important distinguishing factor in this case is Ms. McNicoll's lack of premeditation.  Ms. McNicoll interviewed with the FBI and acknowledged in that interview, as well as in the factual basis of her plea, that she was at the Capital that day, but specified that she only went to Washington D.C. to hear the former President speak and to sightsee since she was in the city.  Complaint at 8 ("she learned via YouTube that former President Trump (Trump) would be speaking in Washington D.C. (D.C.) on January 6, 2021. The defendant further stated that accordingly, she traveled from California to D.C. on January 2 or 3, 2021, to be able to attend his speech.  On January 4 and 5, 2021, she walked around D.C. sightseeing."); Plea Ag. Statement of Offense at ¶ 8 (Dkt No. 24) ("The purpose of Ms. McNicoll's trip to Washington D.C., was to hear former President Trump speak and show her support for the former president by attending his rally.")  While numerous January 6th defendants traveled to Washington D.C. primarily to participate in the events at the Capital, Ms. McNicoll did not.  She intended to join the speech and rally at the Ellipse, but other that only intended sightseeing.  Complaint at 8.  She admitted that she followed the marching group to the Capital, but it was not preplanned for her to attend the Capital that day and she explained that when she went in the building, "at that point, she was somewhat unaware of what was going on around her."  *Id.*[1]

---

[1] Many January 6th defendants have shared the effect of the crowd and mob-mentality on their decision making that day.  *See*, *e.g*. The Mob Made Me Do It: Rioters Claim Jan 6. Crowd at Fault, AP News, available at https://apnews.com/article/dc-wire-michael-pence-donald-trump-capitol-siege-government-and-politics-6434e5ba1e5d762be91dc971706dd0b9 (May 23, 2021) (last visited August 9, 2022).  To be clear, Ms. McNicoll does not blame the crowd.  The defense mentions the conditions at the Capital that day because they have a direct bearing on the level of culpability Ms. McNicoll has within the spectrum of the individuals at the Capital building.

Under the government's own proposed factors (Gov't Sentencing Mem. at 15 (Dkt. No. 28)), Ms. McNicoll's conduct places her in the least offensive level of defendants. According to the government, the Court should consider the following:

1. "whether, when, and how the defendant entered the Capitol building" (*id.*): Ms. McNicoll entered the Senate Wing Door after individuals had already "broke out the door" and it had been open with people continuously walking in for at least eight minutes. Plea Ag. Statement of Offense at ¶¶ 9-10. Ms. McNicoll did not participate in any breach, nor do photo or video evidence show that Ms. McNicoll witnessed the breach. Because of the time she reached the Senate Wing Door (sometime after what is commonly referred to as the second breach of that door), Ms. McNicoll merely walked in the door following the crowd.

2. "whether the defendant encouraged violence" (Gov't Sentencing Mem. at 15): There are no allegations that Ms. McNicoll engaged in or encouraged any violence.

3. "whether the defendant encouraged property destruction" (*id.*): There are no allegations that Ms. McNicoll engaged in or encouraged any property destruction.

4. "defendant's reaction to acts of violence or destruction" (*id.*): Other than the government's colorful descriptions of what every January 6th defendant may have seen or experienced that day, there are no specific allegations that Ms. McNicoll herself saw violence and destruction. It is worth point out that Ms. McNicoll is a petit, elderly woman whose line of sight would have been limited in a crowd.

5. "whether, during or after the riot, the defendant destroyed evidence (*id.*): There are no allegations that Ms. McNicoll destroyed any evidence.

6. "the length of the defendant's time inside of the building and exactly where the defendant traveled" (*id.*): Ms. McNicoll walked into the building at 2:55 p.m. and

---

Some of the individuals present at the Capital at January 6th had better insight into what events were transpiring, had more dangerous goals for being at the Capital, and had communications with others about going to the Capital that day. These individuals premeditated approaching and even entering the Capital, whereas Ms. McNicoll did not.

4

walked into the Crypt, where photos and video evidence shows she stayed from 3:03 to she left the building at 3:33 p.m.  Plea Ag. Statement of Offense at ¶ 10.  Ms. McNicoll walked in circles in the Crypt.  Gov't Sentencing Mem. at 16.  She did not enter any office or approach the House and Senate Floors.  With the exception of walking around the Crypt, her path through the Capital followed a relatively straightforward and natural path that the crowd would have taken.

7. "the defendant's statements in person or on social media" (Gov't Sentencing Mem. at 15): Ms. McNicoll has made no statements on social media.  She interviewed with law enforcement and made no political statements other than admitting she went to hear former President Trump speak.  She admitted she went into the Capital.

8. "whether the defendant cooperated with, or ignored commands from police officers" (*id.*): The government acknowledges that Ms. McNicoll left the Capital when instructed by police officers.  *See id.*. at 16 ("ushered" out by police without incidence); Plea Ag. Statement of Offense at ¶ 10 ("At that time, and at the direction of police officers, Ms. McNicoll left the Capitol").

9. "whether the defendant demonstrated sincere remorse or contrition" (*id.*):  Ms. McNicoll has accepted responsibility for entering the Capital that day, including admitting it once FBI agents interviewed her, and pleading guilty in this case.  She is remorseful.  Exhibit A ("I regret entering the Capital on that day.  I am very remorseful about this action.  I would never do this again.").  Also, Ms. McNicoll has already paid the restitution in this case, further demonstrating her acceptance of responsibility.  Exhibit E.

The government's sentencing memorandum suggests that the Court should assess Ms. McNicoll's individual conduct by looking at their proposed factors above for "critical aggravating and mitigating factors," but a review of these factors does not support their proposed sentence of custody time for Ms. McNicoll.  The above factors support a much lighter sentence in Ms. McNicoll's case, particularly considering several of the factors do not even apply to her

5

case. A noncustodial sentence is particularly justified when comparing Ms. McNicol with other misdemeanor defendants, many of whom traveled specifically to join the events at the Capital, entered during more violent time frames, livestreamed or tweeted from the Capital, or posted on social media following the event expressing their support for the events that day.

The government's arguments regarding why the circumstances of Ms. McNicoll's offense justifies custody time draws heavily on reports from what happened at the Capital, but are not particularized to Ms. McMcNicoll. Dkt. No. 28, Gov't Sentencing Mem. at 15-17. There are no specific allegations by the government that when Ms. McNicoll was at the Capital, she crossed or saw any barriers or barricades, witnessed any violence, or observed any encounters with law enforcement. *Id*. at 15. Instead, the government's sentencing recommendation acknowledges that the defendants "**may** have observed" fighting and smelled chemical irritants "[d]epending on timing and location of their approach," and that it was just "likely" the defendants crossed barriers or heard violence. *Id*. (emphasis added). Ms. McNicoll's sentence should be based on her actual conduct, rather than the blanket assertions about what happened that day. *See United States v. Shemirani*, 802 F.3d 1, 4 (D.C. Cir. 2015)(citing *Gall v. United States*, 552 U.S. 38, 52, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) ("Defendants are entitled to an individualized consideration by the sentencing judge.").

The government also suggests that Ms. McNicoll was aware she could not enter the Capital that day simply because she was a Los Angeles County employee, but submits no evidence that Los Angeles County buildings require security measures to enter them and no specifics about the building where Ms. McNicoll worked (it is unclear whether Ms. McNicoll had any security measures to complete before entering her workplace, where her most recent positions were focused on policies and legislative analysis). Gov't Sentencing Mem. at 17. Additionally, the government relies on Ms. McNicoll's prior visit to the Capital to illustrate she should have known the proper procedures for admittance to the Capital, but the government is not aware (nor does it seem to care) that Ms. McNicoll's prior visit was part of a special tour which included visits to more secured areas of the Capital.

6

For these reasons, the circumstances of the offense warrant a sentence of 12 months of probation for Ms. McNicoll.

## B.     MS. MCNICOLL'S HISTORY AND CHARACTERISTICS JUSTIFIES A PROBATION SENTENCE

Until January 6th, 2021, Ms. McNicoll lead a law-abiding life entirely free of criminal history.  Ms. McNicoll dedicated a majority of her working life to public service, working for over 35 years in Los Angeles County's Department of Public Social Services ("LAC DPSS"), the agency providing welfare, disability, and healthcare assistance to millions of Los Angeles county citizens.  Draft PSR at ¶ 49.  She also raised two children.  Draft PSR at ¶ 35.  She is now in her 70's and recently retired.

Ms. McNicoll's life is marked by a traumatic marriage to a volatile and abusive husband.  Draft PSR at ¶ 35.  Her ex-husband emotionally and physically abused her.  *Id*.  He also threatened their children.  *Id*.  Ms. McNicoll shared during the probation interview that she eventually discovered that her husband was using drugs, likely the underlying cause of the abuse.  She often had to stay with her sister when her husband was abusive.  *Id.*  During the probation interview, Ms. McNicoll also shared that she resided in shelters with the children when necessary.   Ms. McNicoll initiated divorce proceedings after her ex-husband held a gun to her head.  *Id*.  Despite her struggles in her marriage, Ms. McNicoll found strength to leave her husband and raise her two children alone.  Without a college degree but needing to provide for two young children as her marriage disintegrated, Ms. McNicoll started with LAC DPSS and worked her way up.  She has a long and steady employment history that reflects well on her character.  Draft PSR at ¶ 49.

Ms. McNicoll's neighbor Angela Adams provides insight into Ms. McNicoll's dedication to her job and her hard-working nature, describing how Ms. McNicoll would leave for work at 4:30 a.m. and return home at 7 pm.  Exhibit B (Adams Letter).  Letters of support further illustrate Ms. McNicoll's good character.  Ms. McNicoll's sister describes Ms. Mcnicoll as "honest" with a "high moral compass."  Exhibit B (Mocalis Letter).  Her letter shares anecdotes

7

reflecting Ms. McNicoll's work ethic, including that she assisted Los Angeles County with the implementation of Obamacare, and Ms. McNicoll's caring side, including when Ms. McNicoll cared for her sister when her sister was ill. *Id*. Her neighbors wrote letters, describing her as "positive and genuine," "fair and honest," hard-working," and "generous." Exhibit B (Vaughn and Adams Letters). Ms. McNicoll's sister's letter discloses that Ms. McNicoll was never arrested before this offense. It should be noted that in addition to having zero criminal history, Ms. McNicoll also has no history of drug or alcohol abuse.

Ms. McNicoll has led a relatively quiet life until the January 6th events pushed her into the spotlight (she has since been in the news). Despite the media maelstrom around the January 6th cases, Ms. McNicoll does not use social media and has not posted anything about the events of January 6th. She does not discuss the events of that day with anyone and shiess away from the limelight that this offense has brought to her door. She is remorseful for entering the capital that day.

Additionally, Ms. McNicoll, a private person who largely lived her life under the radar before this case, has suffered great personal consequences already (mental health issues, targeted for identity theft, received death threats, and pushed into retirement early after 35 years with her employer). Ms. McNicoll now simply hopes to serve her punishment and travel during her golden years. Exhibit A.

Ms. McNicoll's age, her 70 years of life without criminal history or substance abuse, her 35-years supporting public services for Los Angeles County's most vulnerable communities, the struggles she has gone through in her life, and her good character all call for a noncustodial sentence.

C.       **THE TRADITIONAL GOALS OF SENTENCING CALL FOR A NONCUSTODIAL SENTENCE**

   1.    **A Noncustodial Sentence Serves As Adequate Deterrence In This Case**

This prosecution, the public scrutiny and shame, and the experience of going through the federal court criminal justice system (including her arrest and detention for a day) all serve as

8

adequate deterrence in this case.  This prosecution has upended Ms. McNicoll's life, including forcing her into early retirement after 35 years of service with LAC DPSS, death threats being sent to her, and a brutal, months long case of what appears to be targeted identity theft starting just days after she made local news headlines for her arrest and spanning several months.  Draft PSR at ¶ 40.  Ms. McNicoll suffered almost crippling anxiety from the constant onslaught of consequences in her life when this case was first filed and is currently receiving mental health treatment.  *Id*.  A custodial sentence is not necessary to further deter Ms. McNicoll.

The government acknowledges that their requested sentence is based on "general deterrence" (Gov't Sentencing Mem. at 18 ("The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the capital . . . . general deterrence may be the most compelling reasons to impose a sentence of incarceration."), rather than specific deterrence (*id*. at 19).  When discussing specific deterrence, the government only cites the length of Ms. McNicoll's time in the Capital, as well as a misleading assertion that Ms. McNicoll lacked candor with the FBI because she did not remember she took photos in the Capital.[2]  The government's recommendation in Ms. McNicoll's case contradicts their recommendations in many cases where defendants with equal or more egregious conduct, with most of those defendants receiving probation or home detention.  *See* Exhibit D (sentencing chart reflecting approximately 114 noncustodial sentences highlighted in yellow and green, many with the government's recommendation of a noncustodial sentence).

While the need for general deterrence is legitimate, it has been met already in this case given the scope of these prosecutions.  No January 6th defendant is escaping their conduct that

---

[2]  The defense submits that the government's arguments that Ms. McNicoll lacked candor when she said she did not take photos in the Capital should be ignored.  The government has no insight into Ms. McNicoll's mind and intent when she made those statements.  She was forthcoming in that interview about every other aspect of her participation and simply did not remember that she did take photos.  As previously mentioned, Ms. McNicoll is 70 years old, does not rely on technology, does not use social media and thus would never have accessed her photos, and was particularly likely to forget what happened exactly that day considering how overwhelming the events were.

9

day and this message has been well-spread.

## 2. A Probationary Sentence Aligns Ms. McNicoll With Other January 6th Defendants With Similar Conduct

Defendants with conduct similar to, or even more egregious than, Ms. McNicoll have received noncustodial sentences. According to the government's chart of sentencings in January 6th cases, approximately 114 defendants have received noncustodial sentences and approximately 12 have received 12 months or less of probation. *See* Exhibit D (green highlights represent sentences of 12 months probation or less and yellow highlights represent all other noncustodial sentences).

The examples of noncustodial January 6th sentences are numerous. *See* Exhibit D (yellow and green highlights representing noncustodial sentences, with green representing individuals who received 12 months probation or less). Just focusing on the facts in a few of these cases more than illustrates that a noncustodial sentence is justified in this case. *See*, *e.g.*, *United States v. Valerie Ehrke*, D. D.C. Case No. 1:21-97-PLF (36 months probation with community service where defendant had no preplanning and limited social media, but had criminal history); *United States v. Eliel Rosa*, 1:21-CR-00068-TNM (12 months probation where defendant was in the Capital for 20 minutes and posted on social, among other things, that she "stormed the Capital" and "We need a Revolution!"); *United States v. Jeffrey Witcher*, 1:21-cr-00235-RC (defendant received 12 months probation when he chanted in the Capital and called law enforcement officers "traitors" and he admitted to deleting evidence from his phone); *United States v. Gary Edwards*, 1:21-cr-366-JEB (68-year old defendant received 12 months probation with community service and a fine when he entered through the same door as Ms. McNicoll, entered into a Senate office, and was in the building for 24 minutes).

A noncustodial sentence, with the government's requested 60 hours of community service and the already-paid restitution, aligns Ms. McNicoll with the other defendants sentenced for January 6th. Because Ms. McNicoll's conduct places her in the least egregious category of defendants (no pre-planning, no violence, no social media, among other factors), and considering

her age and life history, sentencing Ms. McNicoll to any term of imprisonment would create an unwarranted sentencing disparity.

### III. A SPLIT SENTENCE IS NOT LAWFUL IN THIS CASE.

The government relies on *United States v. Little*, 21-cr-290 (RBW) as the authority to support its argument for a split sentence in this case. Reliance on *Little* is misplaced because the Court in *Little* incorrectly determined the lawfulness of a split sentence, relying not on the applicable statutory provisions, but instead on its opinion that "[o]nly a split sentence would adequately serve the goals of sentencing described in 18 U.S.C. § 3553." *Little* Op. at 4–5. The Court does not have the authority to set the outer bounds of criminal punishment: "the scope of judicial discretion with respect to a sentence is subject to congressional control." *Mistretta v. United States*, 488 U.S. 361, 364 (1989); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76 (1820); *Ex parte United States*, 242 U.S. 27 (1916). For the reasons below, this Court should reject *Little*'s faulty interpretation of § 3561(a)(3).

**A.    Section 3561(a) Is Not A "Grant of Authority"—It Is a Limiting Provision.**

The court's opinion in Little is premised on its incorrect view of § 3561 as "a grant of authority," with an exception (subsection (a)(3)) and an exception-to-the-exception (the petty-offense clause in subsection (a)(3)). *Little* Op. at 7–8. But § 3561(a) does not "largely reiterate[] the same rule found in § 3551," *id*. at 7, or expand the authority granted in § 3551 (which provision is entitled "Authorized sentences"). Instead, as a whole, § 3561(a) further limits the use of probation. It prohibits probation in three circumstances: probation is not permitted (1) if "the offense is a Class A or Class B felony and the defendant is an individual," (2) if the offense of conviction is one for which the Code expressly excludes probation, or (3) if "the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." The first two of three subsections plainly circumscribe a court's authority to impose a term of probation. Thus, the court's characterization of § 3563(a)(3) as "a grant of authority" "largely reiterat[ing]" § 3551(b)'s general grant of authority is simply inaccurate. Section 3561 sets applicable prohibitions on probation; it does not, as the government and Little

11

suggest, expand the use of probation to create the possibility of a "split sentence" for any and all petty offenses.

**B.      Little's Interpretation of § 3563(a)(3) Is Grammatically Incorrect, Divorced from Context, and Disregards § 3551(b).**

According to *Little*, "'same' functions as an adjective," not a pronoun, and thus the "petty-offense clause" (i.e., "that is not a petty offense") extends to both "the same" and "a different offense." *Little* Op. at 8–10.  *Little* reasoned that the "[t]he phrase . . . lacks obvious indicators that 'same' is functioning as a pronoun or that the backward reach of the petty-offense clause should be limited to only 'a different offense.'" *Id*. at 9.

*Little* does not acknowledge or address the most "obvious indicator[] that 'same' is functioning as a pronoun": grammatically, the use of the word "*that*" instead of "*which*" is both obvious and significant.  "*That*" denotes a restrictive relative clause, rather than a nonrestrictive relative clause (signaled by "a comma plus *which*").  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 142 & n.7 (2012).[3]  Accordingly, "*that*" restricts "is not a petty offense" to "a different offense" such that the phrase "that is not a petty offense" modifies solely "a different offense"; it does not modify "the same."

Legislators "are presumed to be grammatical in their compositions" and "[g]rammatical usage is one of the means . . . by which the sense of a statute is conveyed[.]  *Id*. at 140–41.  Had the drafters meant for "is not a petty offense" to apply to both "the same" and "a different offense," the proper wording of subsection (a)(3) would have been: "the same or a different offense*, which* is not a petty offense."  The drafters instead properly used "that" as a defining relative pronoun.  *Id*. at 143.

---

[3] For example, compare "Republicans oppose new taxes that are unnecessary. (Restrictive meaning: only unnecessary new taxes are anathema.)," with "Republicans oppose new taxes, which are unnecessary. (Nonrestrictive meaning: all new taxes are anathema.)." *Id*. (emphasis added). In subsection (a)(3), "that" provides a restrictive meaning.

The use of the disjunctive "or" in the statute ("the same *or* a different offense") "is also instructive" and indicates that the later modifying clause does *not* carry over to the term that precedes the disjunctive. *United States v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately.") (quoting *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975)).

*Little*'s reliance on a "lack[] [of] 'unexpected internal modifiers or structure'" and "[n]o comma separat[ing] the phrases 'the same' and 'or a different offense'" (*Little* Op. at 9) is unpersuasive. Section 3563(a)(3) "does not contain items that readers are used to seeing listed together or a concluding modifier that readers are accustomed to applying to each of them." *Lockhart v. United States*, 577 U.S. 347, 352 (2016). Readers are not accustomed to seeing "the same or a different offense" together because it is entirely redundant: "the same or a different offense" is simply "an offense" or "any offense."

Indeed, *Little*'s interpretation renders "the same or a different" in § 3561(a)(3) meaningless: to permit split sentences for any and all petty offenses, the drafters would have and could have said succinctly "*any* offense that is not a petty offense" as opposed to "*the same or a different* offense that is not a petty offense." The lack of a comma similarly cuts against *Little*'s interpretation and supports Ms. McNicoll's position that the petty-offense modifying clause is restricted to "a different offense." *See supra* note 2.

*Little* disregarded that "'different offense' is set off by the word 'a'" as "grammatically necessary" but not indicative of a separation between "the same" and "a different." *Little* Op. at 9. The court failed to recognize that the word "a" can and does play both roles: while grammatically necessary, the insertion of the determiner "a" before "different offense" also cuts off the modifying phrase "that is not a petty offense" so that it does not reach backward to "the same."

The court also improperly rejected (*Little* Op. at 9–10) the "timeworn textual canon" of the "rule of the last antecedent." *Lockhart*, 577 U.S. at 351. Here, as in *Lockhart*, "the interpretation urged by the rule of the last antecedent is not overcome by other indicia of

13

meaning. To the contrary § [3561(a)(3)]'s context fortifies the meaning that principle commands." *Id*. at 352. Reading the phrase "that is not a petty offense" to modify only "a different offense" is the grammatically correct reading of § 3561(a)(3), as well as the only reading that is consistent with the purpose of § 3561(a) and the entire sentencing scheme as a whole. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988); Scalia & Garner at 167 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

Citing *Paroline v. United States*, 572 U.S. 434, 447 (2014), *Little* ultimately appears to resort to the "so-called series-qualifier canon," *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2448 (2021), to conclude that "the reach of the petty-of clause extends all the way to 'the same or a different offense,'" *Little* Op. at 12. "The series-qualifier canon gives way when it would yield a 'contextually implausible outcome.'" *Yellen*, 141 S. Ct. at 2448 (citation omitted) (rejecting D.C. Circuit's application of the series-qualifier canon and reversing *Confederated Tribes of the Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 22–23 (D.C. Cir. 2020)). In addition, the court in *Paroline* was interpreting a statute with six enumerated subprovisions, the last of which was a "catcall clause." *Id*. The court held that the "catchall" clause "is most naturally understood as a summary of the type of losses covered" in the prior five subprovisions. *Id*. Section 3561(a)(3) is not at all similar. *Paroline* thus provides no support for *Little*'s holding.

For "context," *Little* effectively looked solely at "the [petty-offense] phrase itself" in isolation. *Little* Op. at 9. While the court purported to look at the introductory language and each subsection of § 3561, *id*. at 9–10, the court failed to acknowledge that § 3561(b) operates on the whole as a limiting provision. The court also effectively ignored § 3551(b). The court did not consider § 3551(b) to be part of the context in which § 3561(a)(3) must be interpreted and, instead, wrote it off as a provision that "ordinarily" but does not always apply. *Id*. at 7.

14

The plain text of § 3551(b), entitled "Authorized sentences," authorizes only imprisonment "*or*" probation, not both.  Section 3551(b) lists in the disjunctive three different types of sentences—a term of probation, a fine, and a term of imprisonment—and then provides that "a sentence to pay a fine may be imposed in addition to any other sentence."  The fact that the statute specifies that only one type of sentence—a sentence to pay a fine—can be imposed in addition to a sentence of probation or a sentence of imprisonment underscores that the other two types of sentences—probation and imprisonment—are mutually exclusive.  The statute thus provides a court with the clear dichotomous choice between imposing a sentence of a term of imprisonment and imposing a sentence of a term of probation for "an offense," *i.e.*, any one single count of conviction.

*Little* also ignored the conflict between §§ 3561(a)(3) and 3551(b) that its interpretation creates, which even the government concedes exists under that interpretation.  *See United States v. Jeremiah Caplinger*, No. 21-cr-342 (PLF), Gov't Resp. to Suppl. Brs. at 4, ECF No. 56 (D.D.C. Mar. 9, 2022) (acknowledging "conflict between those provisions" but arguing conflict "is readily reconciled").  "There can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."  Scalia & Garner at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").  Under the correct interpretation of § 3561(a)(3), discussed above, there is no conflict.

**C.**   ***Little*'s Interpretation of § 3563(a)(3) Makes No Sense in Context; The Correct Reading Does.**

Under the plain text and grammatically correct reading of subsection (a)(3), a term of probation for an offense is not permitted if the defendant is sentenced in the same sentencing proceeding to a term of imprisonment for the same offense conviction, but a term of probation is permitted if the defendant is sentenced at the same sentencing proceeding to a term of imprisonment for a *separate* conviction that is a petty offense.  Contrary to *Little*'s assertion, "there are [*particular*] circumstances in which Section 3561's narrow carveout for petty offenses

15

would apply." *Little* Op. at 12–13, 15.[4]  Specifically, when a defendant is sentenced for two separate offenses of conviction at the same time, one of the two offenses is a petty offense, and the court imposes imprisonment for that petty offense, then the court can impose probation for the second offense.  In other words, befitting its status as a petty (*i.e.*, minor) offense, a court can impose imprisonment (a short term of 180 days or less) for a petty offense and impose probation (and no term of imprisonment) on a separate (petty or non-petty) offense of conviction.[5]  Where, as here, there is solely *one* petty offense conviction, a combined probationary and prison sentence is not statutorily authorized.

While the wording of the § 3561(a)(3) is perhaps inartful, when read correctly, the provision makes sense in the context of modern federal sentencing under the Sentencing Reform Act ("SRA").  The SRA eliminated "split sentences," abolished parole, and added the possibility of a term of supervised release imposed as part of a term of imprisonment.[6]  Probation and supervised release are separate and distinct forms of sentences.  Probation is an alternative to incarceration— imposed instead of and in lieu of a term of imprisonment.  By contrast, supervised release is part and parcel of a term of imprisonment.  Thus, the federal sentencing system was designed to prevent a defendant from being on probation and supervised release at the same time. Because supervised release is not authorized for a petty offense, when a sentence

---

[4] By contrast, as discussed above, *Little*'s interpretation renders the phrase "the same or a different" meaningless and does not "give[] fully meaning and effect to all the words in § 3561(a)." *Little* Op. at 13, 15.

[5] By contrast, if the court imposes imprisonment for a non-petty offense, the court may not impose probation for the petty offense; the court must impose imprisonment for both offenses, and supervised release could follow for solely the non-petty offense. Similarly, if the court imposes probation for a petty offense, the court may not impose imprisonment for a non-petty offense; the court must impose probation for both offenses.

[6] *See* U.S.S.G. § 5B1.1(b)(3) & comment. (backg'd) (2018) (identifying § 3561(a)(3) as the provision that "effectively abolished the use of 'split sentences' imposable pursuant to the former 18 U.S.C. § 3651," but noting that "the drafters of the Sentencing Reform Act noted that the functional equivalent of the split sentence could be 'achieved by a more direct and logically consistent route' by providing that a defendant serve a term of imprisonment followed by a period of supervised release") (citing S. Rep. No. 225, 98th Cong., 1st Sess. 89 (1983)).

of imprisonment is imposed for a single petty offense, it is served and then it is done; no court supervision may follow.  Only then, in that situation, (where the defendant is sentenced to a *short* term of imprisonment and no supervision of any kind may follow) is it possible for the court to subsequently supervise the defendant on a term of (either) probation or supervised release for a separate offense of conviction without timing and sentence calculation issues.  *Cf.* 18 U.S.C. § 3564(a) ("A term of probation commences on the day that the sentence of probation is imposed, unless otherwise ordered by the court.").

Because the supervised release provision, 18 U.S.C. § 3583(a), expressly prohibits supervised release after imprisonment for a petty offense, *Little* suggests that "Section 3561 provides an alternative way for the Court in petty-offense cases to engage in 'postconfinement monitoring' after the defendant is released from imprisonment." *Little* Op. at 14–15.  But nowhere did Congress express a goal of having every offender, regardless of his offense of conviction, on post-confinement monitoring.  In fact, the supervised release statute expressly indicates Congress's goal was the opposite—to prohibit post-confinement monitoring of petty offenders.  If Congress wanted to provide some degree of supervision for a person sentenced to incarceration for one single petty offense, it could have and would have amended § 3583(b)(3) by simply removing "(other than a petty offense)" to make supervised release available for all misdemeanors.  Such an amendment to § 3583(b)(3) would have ensured the possibility of supervision for petty offenders without reinstating the possibility of a "split sentence," a mechanism that Congress so clearly and unambiguously abolished with the SRA. The fact that Congress did not do so evinces its intent.

Permitting both up to six months of incarceration plus up to five years of probation for one single petty offense makes no sense.  A petty offense is, by nature, essentially the most minor type of charge brought in federal court.  Thus, the government's view, which allows the

possibility of more punishment and a greater expenditure of resources for a petty offender than for a Class A misdemeanant, makes zero sense. [7]

The statute simply does not authorize a harsh increase in petty offense punishment. If Congress had wanted to so drastically change the sentencing scheme for petty offenses, it would have done so in a far more explicit manner. Probation as a sentence may be qualitatively less severe than imprisonment, but it still subjects offenders to "conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). It would be illogical to allow imprisonment and probation for the least serious offenses in the federal system.

**D.     "Common Usage" Is Inapplicable and Inapposite.**

Citing arbitrary civil and regulatory statutes and random "other legal texts," *Little* relied on what it deemed to be "Congress's common usage of the phrase 'the same or a different' in other statutes" to support its conclusion, claiming that Congress "consistently uses 'the same' as an adjective modifying the noun following it." *Little* Op. at 10–11. "Common usage" does not show "that 'same' is functioning as an adjective" in § 3561(a)(3). *Id*. at 11.

As a threshold matter, "common usage" of a word or phrase is generally used in place of and as opposed to "some hidden technical meaning." *Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 158 (D.C. Cir. 1984). The cases cited in *Little* discuss the common usage of the words "public" and "private." *Id*.; *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108–09 (1980). "Common usage" of the phrase "the same or a different" is inapposite here because no party endorses some alternative "hidden technical meaning" of that phrase. Common

---

[7] Under the government's view, a defendant who committed one single petty offense could be punished with 6 months of imprisonment followed by five years of court supervision ("probation"); whereas, a defendant who committed a Class A misdemeanor, if sentenced to any amount of imprisonment at all, could be sentenced only to one year or less of court supervision ("supervised release"). Statutes should be construed to avoid such absurd results. *See, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68–70 (1994); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 453–455 (1989); *United States v. Turkette*, 452 U.S. 576, 580, (1981); *Holy Trinity Church v. United States*, 143 U.S. 457 (1892); *United States v. Kirby*, 74 U.S. 482 (1868).

usage does not tell a reader anything about the operation of "that is not a petty offense" in the provision.

Moreover, none of the random statutes and "other legal texts" *Little* cites contain the phrase "the same or a different" followed by a modifying clause beginning with the word "that," as in § 3561(a)(3). *See* Little Op. at 10–11 (citing various civil procedural laws, rules, and treatises). Because all are distinguishable in that key way, none supports *Little*'s holding. *Little* cites no other criminal statute using the phrase "the same or a different" and the defense can locate none. Congress's use of the phrase is apparently exceedingly rare, not common.

**E.     Section 3561(a)(3) Does Not Provide "An Exception to § 3551's Default Rule."**

*Little*'s reliance on § 3551(a) (*Little* Op. at 13–14) is misplaced. Section 3551(a) provides that "[e]xcept as otherwise specifically provided, a person found guilty of an offense" must be sentenced "in accordance with the provisions of this chapter [chapter 227] so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent they are applicable in light of all the circumstances of the case." It is undisputed here that Ms. McNicoll must "be sentenced in accordance with the provisions of" chapter 227 to meet the purposes of sentencing listed in § 3553(a)(2)(A) through (D). Nothing "otherwise specifically provide[s]" that a defendant sentenced for violating 40 U.S.C. § 5104(d) should be sentenced pursuant to sentencing provisions of some other chapter "so as to achieve" some other purpose. Section 3561(a)(3) does not provide "otherwise," nor does it void or somehow override the unambiguous prohibition barring a sentence of both imprisonment and probation for "an" (*i.e.*, one single) "offense" in § 3551(b).

The "general/specific canon," Scalia & Garner at 183–184, also does not apply here. *Little* Op. at 14–15 & n.2. That canon of construction applies only when there is a conflict between general and specific provisions, Scalia & Garner at 183–184, or "[w]here there is no clear intention otherwise," *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *see id*. at 551 ("When there are two acts upon the same subject, the rule is to give effect to both if possible…The intention of the legislature to repeal must be clear and manifest.") (quotation

marks and citation omitted).  Here, as discussed above, there is no conflict between §§ 3551(b) and 3561(a)(3) under the correct interpretation and Congress intent to prohibit split sentences is clear and manifest.

**F.    Little Failed to Consider the Legislative History and Constitutional Concerns.**

*Little* failed to consider the legislative history and constitutional concerns, both of which support defendant's interpretation.

## IV. CONCLUSION

For the reasons discussed above, Ms. McNicoll should be sentenced to 12 months of probation with community service.  She has already paid the restitution.

Respectfully submitted,


DATED:  August 29, 2022            By  */s/ Lillian Chu*
                                                                    LILLIAN CHU
                                                                    Deputy Federal Public Defender
                                                                    CA Bar No. 279095
                                                                    411 West Fourth Street, Suite 7110
                                                                    Santa Ana, California  92701-4598
                                                                    Telephone:  (714) 338-4500
                                                                    E-Mail:  lillian_chu@fd.org